**PEER INTERNATIONAL CORPORA-
TION, Peermusic Ltd., Temi Combine,
Inc., Leo Musical, S.A., Editorial Musi-
cal Latino Americana, S.A. and EMI
Blackwood Music Inc., Plaintiffs,**

v.

**LUNA RECORDS, INC. and Abel
De Luna, Defendants.**

No. 92 Civ. 9295 (SS).

United States District Court,
S.D. New York.

April 28, 1995.

562

Silverman & Shulman, P.C., New York City (Alan L. Shulman, Scott L. Baker, of counsel), for plaintiffs.

Jacobson & Colfin, P.C., New York City (Jeffrey E. Jacobson, Bruce E. Colfin, Todd A. Gordon, of counsel), for defendants.

SOTOMAYOR, District Judge.

### AMENDED OPINION AND ORDER [1]

This action arises from the alleged copyright infringement of seven musical compositions by defendants Luna Records, Inc., now known as Luna Music Corporation ("Luna") and Abel De Luna, the individual in charge of Luna. For the reasons discussed below, plaintiffs' motion for summary judgment is granted.

## BACKGROUND

The compulsory license provision of the Copyright Act permits a user to produce and distribute phonorecords embodying a musical composition protected by a copyright upon compliance with statutory and regulatory requisites, including the service on the copyright owner of a notice of intention to make and distribute the phonorecords, and the regular, accurate payment of royalties. 17 U.S.C. § 115 (1988 & Supp. V 1993); 37 C.F.R. § 201.19 (1994). The Act allows the copyright owner to vary the terms set out in the Act upon written agreement with the user, and to terminate the compulsory license, upon thirty days notice, if the copyright owner does not receive payment or statements of account when due from the user. 17 U.S.C. § 115(c)(5). At times prior to the commencement of this action, Luna, a distributor of Spanish music, availed itself of the compulsory license provisions of the Copyright Act.

In 1989, Prager & Fenton, an accounting firm specializing in examinations of entertainment companies on behalf of copyright owners, performed an audit of Luna. The audit, which examined several hundred musical compositions embodied in phonorecords distributed by Luna from the time of the corporation's inception in 1979 through 1988, revealed that Luna had substantially underpaid royalties for many compositions for which it had obtained compulsory licenses,

---

1. The substance of this Amended Opinion and Order is identical to the Opinion and Order issued on March 27, 1995; the changes in this Amended Opinion and Order are technical only and do not alter the legal conclusions of my previous Order.

and owed a total of $722,165.51 in royalties plus interest. In addition, the audit showed that Luna was distributing phonorecords of compositions for which it had never obtained licenses. Aff. Abraham Kahaner, Ex. 1.

At issue in this action are only seven of the hundreds of compositions distributed by Luna: five of these were the subject of compulsory licenses (the "licensed compositions"), and two were never licensed (the "unlicensed compositions"). The two unlicensed compositions are owned by plaintiffs EMI Blackwood Music Inc. ("EMI") and Temi Combine, Inc. ("Temi").[2] De Luna Dep., attached to Affirmation of Scott L. Baker in Supp. Pls.' Mot.Summ.J. at Exs. 5–22 [hereinafter De Luna Dep.], at 40–43, 156–158; Aff. Kenneth B. Higney ¶¶ 10–12. For the five remaining compositions, plaintiffs Peer International Corporation ("Peer"), Peermusic Ltd. ("Peermusic"), Leo Musical, S.A. ("Leo"), and Editorial Musical Latino Americana, S.A. ("EMLASA"), through their common agent, the Harry Fox Agency ("Fox"), had issued Luna written variations of the compulsory licenses.[3] The variations with Luna incorporated and preserved all statutory rights under 17 U.S.C. § 115, except the variations permitted Luna to dispense with the statute's requirement that a notice of intention be filed with the copyright owner before or within thirty days after making and before distributing any phonorecords of a copyrighted work, *see* 17 U.S.C. § 115(b), and authorized Luna to pay royalties and submit account statements quarterly instead of monthly, *see* 17 U.S.C. § 115(c)(4).

On behalf of the plaintiffs representing the licensed compositions, their agent Fox sent Luna a notice on August 29, 1989 (the "August 1989 notice") stating that the licenses would be terminated if Luna did not render $722,165.51, the full payment for the deficiencies uncovered by the audit, within thirty days. Luna did not render a partial payment until December 1989, in the amount of $9,747.00. A year later, on September 6, 1990, Fox sent Luna a second notice (the "September 1990 notice"), again stating that termination of the licenses would occur unless the default in royalty payments was remedied within thirty days. Luna did not make another payment within thirty days of the September 1990 notice, and continued to distribute all seven compositions. All plaintiffs contend that Luna's continued distribution of the licensed and unlicensed compositions after receipt of the September 1990 termination notice constitutes willful infringement of their copyrights.

Luna argues that any infringement of plaintiffs' copyrights was accidental in nature. Regarding the unlicensed compositions, Luna claims it was unaware that it was distributing music for which it had obtained no licenses, and points out that it made royalty payments on the two unlicensed compositions. Defs.' Mem.Law Opp'n Pls.' Mot. Summ.J. at 5–6. Regarding the licensed works, Luna contends that plaintiffs' revocation of their licenses was invalid, as Luna was not aware that plaintiffs intended to revoke the licenses, but rather, believed that the parties were engaged in negotiations in the years 1989 and 1990 over the amount of Luna's liability. Luna points out that Prager & Fenton's original finding of liability in the amount of $722,165.51 was revised to less than half that amount, $354,948.41, subsequent to Luna's making available to the auditors sales records and royalty data for the period 1979–83. In addition, Luna notes that because the texts of the August 1989 and September 1990 notices were identical, and because the August 1989 notice did not terminate the licenses, Luna had no reason to believe that the September 1990 notice did so either.

As evidence that the August 1989 notice was not meant to terminate the licenses, Luna points to a number of payments it made to plaintiffs through Fox after that notice: in addition to the December 1989

---

**2.** The unlicensed compositions were "Angel in the Morning" owned by EMI and "You Decorated My Life," with and without Spanish equivalent titles, owned by Temi.

**3.** The following musical compositions were the subjects of written variations of compulsory licenses: "Dos Amores" and "Ambición" from Peer, "¿Y Como Te Va Con El?" from Peermusic, "Se Marcho" from EMLASA, and "Mi Soldadita" from Leo.

payment for $9,747.00, Luna made two payments in March 1990 in the amounts of $27,528.69 and $27,432.93, and one payment in August 1990 in the amount of $22,830.90. Aff. Opp'n Pls.' Mot.Summ.J. ¶¶ 16–17. Luna also points to its attempts to make royalty payments after the September 1990 notice: On or about December 26, 1990, Luna sent a check to plaintiffs for partial payment in the amount of $35,377.59. Fox endorsed the check with the legend "Without prejudice as to claims of underpayment" and deposited it in an escrow account. Aff. Kevin Au Yeung ¶ 5. Thereafter, on or about July 19, 1991, Luna sent a series of thirteen post-dated checks representing payments for the period ending September 30, 1990. Fox rejected the checks. No payment was attempted by Luna after the post-dated checks were refused. *Id.* ¶¶ 5–8.

Plaintiffs initiated this action for copyright infringement against defendants on December 28, 1992. Luna continued to make and distribute phonorecords containing both the licensed and unlicensed compositions at least until the time of Abel De Luna's deposition, six months after this action was commenced. De Luna Dep. at 66–68, 151–58.

Following initiation of this action, Luna filed for bankruptcy and the litigation against it was stayed. The action and the motion for summary judgment now proceed directly and only against Abel De Luna as the individual in charge of Luna.

## DISCUSSION

### I. *Rule 56: The Standard for Summary Judgment*

Rule 56(c) provides that summary judgment is appropriate when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The burden is on the moving party to show that no genuine issue of material fact exists. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (citation omitted). A genuine issue of material fact exists where "the evidence is such that 'a reasonable jury could return a verdict for the nonmoving party.'" *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 23 (2d Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). In determining whether a genuine issue of material facts exists, all ambiguities must be resolved and all inferences drawn in favor of the nonmoving party. *Id.*

"[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo,* 22 F.3d at 1223–24 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *DiCola v. SwissRe Holding (N.A.), Inc.,* 996 F.2d 30, 32 (2d Cir.1993)). Establishing the "'mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994) (quoting *Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. at 2510). Rather, to defeat a summary judgment motion, the responding party must show the existence of a disputed material fact in light of the substantive law. *Iacobelli Constr.,* 32 F.3d at 23 (citing *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510).

### II. *Personal Liability of Abel De Luna*

Under 17 U.S.C. § 501(a), "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright. . . ." While the Copyright Act does not expressly create any form of liability for infringement by a third party, the absence of express language in the statute does not preclude liability for infringement on parties who have not themselves engaged in the infringing activity. *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 434–35, 104 S.Ct. 774, 784–85, 78 L.Ed.2d 574, *reh'g denied,* 465 U.S. 1112, 104 S.Ct. 1619, 80 L.Ed.2d 148 (1984).

Two types of third-party liability in copyright law have developed: vicarious liability, with roots in the tort doctrine of respondeat superior, and contributory infringement,

which holds liable " '[o]ne who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another....' " *Demetriades v. Kaufmann*, 690 F.Supp. 289, 292–93 (S.D.N.Y.1988) (quoting *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). The appropriate analysis of Abel De Luna's liability in his capacity as president of Luna is under the standard of vicarious liability.

Vicarious liability exists "[w]hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials...." *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir.1963); *see RSO Records, Inc. v. Peri*, 596 F.Supp. 849, 858 (S.D.N.Y.1984) (same); *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F.Supp. 900, 904 (S.D.N.Y.1981) (corporate officer held vicariously liable); *see also, Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir.1985) ("All persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers"); *Southwestern Bell Telephone Co. v. Nationwide Indep. Directory Serv.*, 371 F.Supp. 900, 906 (W.D.Ark. 1974) ("Officers or directors of a corporation guilty of infringement are individually liable if ... they are sole shareholders") (citing *General Elec. Co. v. Wabash Appliance Corp.*, 93 F.2d 671, 674 (2d Cir.1938)); *see generally*, 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.04[A] (1994) [hereinafter Nimmer]. Thus, "benefit and control are the signposts of vicarious liability." *Demetriades*, 690 F.Supp. at 293.

■ Individuals who have the right and ability to supervise infringing copyright activities and a direct financial interest in such activities are not shielded from liability even though they have no actual knowledge of the infringement. The Second Circuit has held that the imposition of vicarious liability, even in the absence of actual knowledge, on those who fail to supervise the conduct of primary infringers better effectuates the policies of federal copyright law. *Gershwin*, 443 F.2d at 1162; *Shapiro*, 316 F.2d at 307.

■ The statements Abel De Luna made while being deposed indicate that he is vicariously liable, jointly and severally with Luna, for any copyright infringement committed by Luna. He is president of Luna, and he concedes that he "determine[s] what is done and what isn't done in the corporation." De Luna Dep. at 12, 21, 150. He is also Luna's sole shareholder and director. De Luna Dep. at 12–13, 21. Moreover, Abel De Luna admits that he did nothing to stop the distribution of the compositions at issue after he was served with the Complaint in this action. De Luna Dep. at 66–68, 154–55. I therefore find that Abel De Luna is individually liable for Luna's copyright infringement because he had the right and ability to supervise Luna's activities and a financial interest in the exploitation of the copyrighted materials.

### III. *The Infringements*

■ In order to prevail on a claim for copyright infringement, plaintiffs must prove two elements: first, that plaintiffs own valid copyrights in their respective compositions, and second, that defendants copied original elements of such compositions without authorization. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1295, 113 L.Ed.2d 358 (1991).

■ Defendants have not challenged plaintiffs' ownership of valid copyrights in the compositions, and before me are certificates of registration issued by the United States Copyright Office to plaintiffs or their predecessors-in-interest for each composition. *See* Aff. Petersen W. Jaegerman, Aff. Mario De Jesus Baez, Aff. Kenneth B. Higney. A certificate of registration constitutes "prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c); *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). The remaining issue, therefore, is whether defendants copied the musical compositions at issue without authorization.

### A. *The Unlicensed Compositions*

■■■ Abel De Luna concedes that "at the time [he] received th[e] audit report in September of 1989 before [him] was a list of unlicensed compositions," including the Spanish language version of "Angel in the Morning" and "You Decorated My Life."[4] De Luna Dep. at 157–58. Therefore, as early as September of 1989, Abel De Luna had knowledge that the above compositions were unlicensed. De Luna Dep. at 40–43, 66–68, 154–58. Moreover, Abel De Luna admits that up until at least the day before his deposition, six months after the commencement of this action, Luna continued to make and/or distribute phonorecord copies of the above compositions without the benefit of a license. De Luna Dep. at 156–58. Thus, no genuine issue as to any material fact exists as to Luna's infringement of the copyrights in the unlicensed compositions, and this infringement alone renders Abel De Luna, as Luna's president and controlling person, liable for copyright infringement.

### B. *The Licensed Compositions*

■■■ Section 115(c)(5) of the Copyright Act authorizes a copyright owner who does not receive royalty payments when due to give written notice to the licensee that, unless the default is remedied within thirty days from the date of the notice, the compulsory license will automatically terminate. Such termination renders the subsequent making or distribution of all previously licensed phonorecords actionable as acts of infringement. 17 U.S.C. § 115(c)(5). The September 1990 notice gave defendants notice of plaintiffs' intent to revoke and terminate their respective licenses unless the default in royalty payments was remedied within thirty days from the notice date.

Abel De Luna acknowledges, on behalf of Luna, that Fox issued the September 1990 notice and Luna received it. De Luna Dep. at 144–46, 153–54. Abel De Luna also concedes that Luna did not remedy the default in royalty payments within the thirty-day cure period. De Luna Dep. at 166–67. Because the defaults were not remedied, under section 115(c)(5) of the Act, the licenses automatically terminated. Moreover, Abel De Luna admits Luna continued to make and distribute the previously licensed phonorecords as late as six months after the commencement of this action. De Luna Dep. at 66–68, 151–156, 163–64, 166–67; Baker Aff., Ex. 23. The commencement of this action should have resolved any doubts defendants might have had concerning whether plaintiffs intended to terminate the licenses. Consequently, there is no genuine issue as to any material fact that De Luna is liable for Luna's copyright infringement under the Act, absent an equitable bar to this action.

### IV. *Defenses*

Abel De Luna contends that summary judgment is improper because genuine issues of material fact exist as to whether the September 1990 notice effectively revoked the licenses, and if so, whether the equitable doctrine of laches bars this action. I disagree.

### A. *Validity of License Revocation and Estoppel*

Abel De Luna maintains that by plaintiffs' acceptance of Luna's payments after the due date stated in the August 1989 notice, plaintiffs established a "course of dealing" or "business practice" whereby Luna could cause a notice of termination to be revoked by remitting payment subsequent to the due date stated in the notice. Emphasizing that the texts of the August 1989 and September 1990 notices were identical, Abel De Luna argues that because the copyright owners did not intend to revoke the licenses after the

---

**4.** Defendants also infringed Temi's exclusive right to prepare derivative works based upon "You Decorated My Life." *See* 17 U.S.C. § 106(2). Instead of simply making and distributing a phonorecord of this composition, as with the other compositions at issue, defendants used the music with completely different Spanish lyrics and retitled the song "Tu Me Enseñaste a Soñar" ("You Taught Me to Dream"). Baker Aff.

¶ 2, Exs. 2, 10, 19. Changing the lyrics of a composition or adapting a composition for a foreign language creates a derivative work, which cannot be prepared without the copyright owner's specific authority. *See* 17 U.S.C. § 101 (definition of "derivative work"); 2 Nimmer § 8.09[B][1]–[2] (unauthorized alteration of lyrics constitutes the infringement of right to prepare derivative works).

August 1989 notice, he had no reason to believe that the September 1990 notice would revoke the licenses. Furthermore, De Luna claims that Fox's acceptance of Luna's December 1990 check terminated any license revocation.

■ I reject De Luna's arguments. He cites no authority for the proposition that plaintiffs' August 1989 notice established a course of dealing or business practice, nor that it was sufficient to create a triable issue of fact as to plaintiffs' intent to revoke the licenses, a proposition rejected in a similar case before the Ninth Circuit. *See Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1334 (9th Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991). Nor does plaintiffs' acceptance of Luna's December 1990 check, which Fox endorsed "Without prejudice as to claims of underpayment" and deposited into escrow, raise a genuine issue of fact over whether plaintiffs intended to revoke the licenses. *Id.* at 1334–35. Moreover, it is unreasonable for De Luna to argue, as he does, that plaintiffs should have returned to Luna the December 1990 check, when Luna appeared to still have owed plaintiffs over $200,000. Most importantly, De Luna's argument loses all credibility in light of the fact that Luna continued to make and/or distribute phonorecords of the seven compositions at issue even after being served in this action. Abel De Luna cannot, after the lawsuit was filed, claim that he did not know that plaintiffs intended to revoke the licenses.

■ Likewise, I reject defendant's estoppel defense. In order to establish estoppel in a copyright infringement action, it must be shown that (1) plaintiffs knew of defendant's infringing conduct; (2) plaintiffs intended that their conduct should be acted on, or behaved in such a way that defendant had a right to believe that plaintiffs so intended; (3) defendant is ignorant of the true facts; and (4) defendant relied on plaintiffs' conduct to defendant's detriment. *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 535 (S.D.N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir.1978).

■ Plaintiffs do not dispute that they had knowledge of Luna's infringing acts. Plaintiffs' conduct, however, gave defendants constructive notice that the viability of the licenses was in question, and Luna and its president De Luna therefore should have taken positive steps to determine the true condition of the relationship. In any event, De Luna cannot escape the fact that Luna continued to make and distribute the infringing phonorecords for at least six months after suit was filed, when any claim of detrimental reliance should have ended.

Except for plaintiffs' knowledge of the infringing acts, De Luna has offered no evidence from which a trier of fact could reasonably conclude that plaintiffs intended defendants to believe that the licenses were not terminated, or that defendants did not understand the true facts. For the above reasons, De Luna's estoppel defense fails.

## B. *Laches*

■ De Luna's equitable defense of laches also fails. Plaintiffs brought this action in December 1992, just over two years after Fox sent Luna the September 1990 notice. The mere passage of time between plaintiffs' knowledge of an infringing act and the filing of a suit is insufficient to establish laches as a bar to litigation. Some prejudice to the defendants must be added to the delay for it to ripen into laches. *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 534 (S.D.N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir.1978). De Luna suffered no such prejudice.

■ Plaintiffs repeatedly put Luna on notice that the continued viability of the licenses was in question; for example, by depositing the December 1990 check from Luna into an escrow account and by rejecting and returning the series of post-dated checks sent from Luna to Fox in July 1990. In light of these facts, defendants assumed the risk of continuing to make and distribute the phonorecords after the September 1990 notice. Moreover, there is no defense to Luna's continuing its activities after the filing of this suit, when the certainty of plaintiffs' intent to terminate could not be disputed. Defendants' unclean hands preclude De Luna from

raising a laches defense. *N.L.R.B. v. Springfield Hosp.*, 899 F.2d 1305, 1312 (2d Cir.1990).

## V. *Remedies*

Having found an infringement of plaintiffs' copyrights, I must now determine the appropriate remedies. Plaintiffs request statutory damages, attorneys' fees, and injunctive relief.

### A. *Statutory Damages*

A copyright owner is entitled to recover the actual damages it suffered as well as any profits made by the infringer attributable to the infringement. 17 U.S.C. § 504(b). Alternatively, under 504(c)(1) of the Act, an owner may elect to recover statutory damages in lieu of other forms of monetary relief. Statutory damages may be awarded in amounts not less than $500 or more than $20,000 for each work infringed, as the court considers just. 17 U.S.C. § 504(c)(1). Where the infringement was committed willfully, a court may increase the award of statutory damages to a maximum of $100,000 per work infringed. 17 U.S.C. § 504(c)(2). Plaintiffs here have elected to recover statutory damages.

■ 1. *Willful Infringement*—A copyright infringement is willful within the meaning of 504(c)(2) for purposes of enhancing statutory damages if a defendant knew that his or her actions constituted an infringement. *Fitzgerald Publishing Co. v. Baylor Publishing Co.*, 807 F.2d 1110, 1115 (2d Cir.1986); *RSO Records, Inc. v. Peri*, 596 F.Supp. 849 (S.D.N.Y.1984). A defendant's knowledge may be actual or constructive, *Fitzgerald* at 1115; in other words, defendant's knowledge may be inferred from his or her conduct. *N.A.S. Import, Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252 (2d Cir.1992). "[R]eckless disregard of the copyright holder's right (rather than actual knowledge of infringement) suffices to warrant award of the enhanced damages." *N.A.S. Import*, 968 F.2d at 252; *see Lauratex Textile Corp. v. Allton Knitting Mills*, 519 F.Supp. 730, 733 (S.D.N.Y.1981).

■ For the same reasons that I reject Abel De Luna's defenses, I find that his infringement of the seven compositions was willful. Plaintiffs have established directly through Abel De Luna's testimony that defendants received the September 1990 notice terminating the licenses at issue unless Luna paid its overdue royalties. Nevertheless, defendant Luna, with Abel De Luna's knowledge, continued to make and distribute the previously licensed and unlicensed phonorecords, even some several months after this action was commenced. De Luna Dep. at 66–68, 156–58. Moreover, as an author of musical compositions himself and an experienced musical publisher "for about 10 to 12 years," who distributed "all the major labels of Spanish music," De Luna Dep. at 9–14, 38–39, Abel De Luna's conduct in ignoring the revocation of Luna's licenses demonstrates, if not actual knowledge, reckless disregard for plaintiffs' copyrights. *See Fallaci v. New Gazette Literary Corp.*, 568 F.Supp. 1172, 1173 (S.D.N.Y.1983) (inferring willfulness from fact that defendant who published a newspaper article without authorization was himself a publisher of a newspaper).

■ 2. *The Amount of Statutory Damages*—Statutory damages should bear some relationship to the actual damages suffered. *RSO Records*, 596 F.Supp. at 862. Congress's provision allowing for a greater award where willful infringements are found, however, indicates that statutory damages serve the dual purposes of the Copyright Act—compensation and deterrence. *Id.* Courts have used a variety of factors to fix the amount of statutory damages, including "fair market value of the rights infringed, revenue lost by the plaintiff and profits gained by the defendant, the infringer's state of mind, and deterrence of future infringement." *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522, 1544 (S.D.N.Y. 1991) (citations omitted).

Before me is a paucity of information on which to base the award of statutory damages. Neither side has ventured an estimation of the fair market value of the rights infringed, nor of the revenue lost by plaintiffs, nor of the profits gained by defendant as a result of the infringements.

The dollar amounts repeatedly quoted in plaintiffs' submissions to the court are somewhat irrelevant. Plaintiffs have emphasized Luna's total liability uncovered by the audit performed by Prager & Fenton in 1989: the initial finding of liability in the amount of $722,165.51, reduced to $354,948.41 after the auditors revised their findings (of which, by my calculations, defendants paid $122,917.11[5], leaving a total remaining liability through 1988 of $232,031.30). This amount, however, represents Luna's underpayment of royalties for several hundred musical compositions, not owned by the plaintiffs. Judging by the schedules affixed to the Prager & Fenton's audit, *see* Aff. of Abraham Kahaner, Ex. 1, the amounts Luna owed for the seven compositions at issue are as follows: $213.65 for "Ambición"; $69.91 for "Dos Amores"; $370.99 each for "Mi Soldadita" and "Se Marcho"; $531.59 for "¿Y Como Te Va Con El?"; $2,384.16 for "Angel in the Morning"; and $166.64 for "You Decorated My Life." The total owed, then, for the compositions at issue for the period through 1988 was $4,107.93; this figure, however, does not include unpaid royalties for the years after 1988.

■ Plaintiffs have urged that upon a showing of willfulness, they are entitled to the maximum amount of statutory damages, $100,000 per infringed work, for a total of $700,000. Plaintiffs misstate the law in this circuit. Statutory damages are not intended to provide a plaintiff with a windfall recovery. *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 677 F.Supp. 740, 769 (S.D.N.Y.1988) (citing *Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651 (2d Cir.1978). Plaintiffs also misstate the law when they argue that because the maximum amount of statutory damages for a non-willful infringement is $20,000, that figure should also represent the minimum amount of statutory damages upon a finding of willfulness. *See, e.g., Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1381–82 (2d Cir. 1993) ("the District Court's award of $15,000

for each work infringed is sustainable with or without a finding of willfulness").

■ Because of defendant Abel De Luna's willful infringement of plaintiffs' copyrights and his continued infringement after the initiation of this action, I find that substantial statutory damages are warranted to deter him from future misconduct. I am mindful, however, of the small amount of actual damages suffered by plaintiffs, of the hardship to defendant personally, and of the liability he continues to face. As a result, I assess statutory damages in the amount of $10,000 for the infringement of each of the licensed works, and more for the infringements of the unlicensed compositions because there is no excuse for De Luna's failure to serve the notice of intent to seek the compulsory licenses for those works or for using Temi's work in a derivative format without permission. Hence, I award $15,000 for the infringement of the unlicensed composition of EMI and $25,000 for the infringement of Temi's composition.

### B. *Attorneys' Fees and Costs*

■ Plaintiffs request reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505. Until recently, this Circuit awarded attorneys' fees to prevailing plaintiffs as a matter of course (although not to prevailing defendants), *see In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 567 (2d Cir.1994), because such practice was thought to "encourage the assertion of colorable copyright claims and to deter infringement …," *Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir.1984), and thus to best serve the policies of the Copyright Act. The Supreme Court rejected this approach in *Fogerty v. Fantasy, Inc.*, —— U.S. ——, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), holding that prevailing plaintiffs and prevailing defendants must be treated alike when courts consider awards of attorneys' fees, and emphasizing that attorneys' fees are not to be automatically awarded to the prevailing party under § 505, but "only as a matter of the

---

5. Luna made payments of $9747.00 in December 1989; $27,528.69 and $27,432.93 in March 1990; and $22,830.90 in August 1990. An additional $35,377.59 was paid in December 1990 and held in escrow.

court's discretion." *Id.* at ——, 114 S.Ct. at 1033.

In *dictum,* the *Fogerty* Court suggested several nonexclusive factors that courts may consider in awarding attorneys' fees, "so long as such factors are faithful to the purposes of the Copyright Act," *id.* at —— n. 19, 114 S.Ct. at 1033 n. 19, including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence," *id.* (quoting *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 156 (3d Cir.1986)). In this case, where I have made a finding of willful infringement, which infringement continued for months after the initiation of this action, and where defendants apparently need to be deterred from future infringement, I find that an award of attorneys' fees is warranted.

It is well established that when awarding reasonable attorneys' fees, courts should " 'consider the amount of work, the skill employed, damages at issue, and the result achieved.' " *N.A.S. Import, Corp. v. Chenson Enters., Inc.,* 968 F.2d 250, 254 (2d Cir. 1992) (quoting *Oboler v. Goldin,* 714 F.2d 211, 213 (2d Cir.1983) (per curiam)); *see Screenlife Establishment v. Tower Video, Inc.,* 868 F.Supp. 47, 53 (S.D.N.Y.1994). Attorney for plaintiffs did not submit such information to the court; I will therefore consider separately submissions for attorneys' fees. To that end, plaintiffs are directed to submit an accounting in accordance with the above standards by no later than April 21, 1995; De Luna can respond by May 5, 1995; any reply brief is due by May 12, 1995.

C. *Permanent Injunction and Destruction of all Infringing Copies and Materials*

 Section 502 of the Copyright Act provides that a court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "The Copyright Act provides the owner of a copyright with a potent arsenal of remedies against an infringer of his [or her] work, including an injunction to restrain the infringer from violating his [or her] rights

[and] the impoundment and destruction of all reproductions of his [or her] work made in violation of his [or her] rights. . . ." *Sony Corp. of America v. Universal City Studios,* 464 U.S. 417, 433–434, 104 S.Ct. 774, 784, 78 L.Ed.2d 574 (1984). Generally, a plaintiff must show the threat of continuing violation in order to be entitled to injunctive relief. *Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1542 (S.D.N.Y.1991).

In the instant action, liability has been determined and there remains a viable threat that Abel De Luna will continue to infringe plaintiffs' copyrights in the future given the nature of his past infringements and his retention of some of the articles used to infringe plaintiffs' copyrights. For these reasons, a permanent injunction will issue and plaintiffs' request is granted that all infringing copies and materials in Abel De Luna's possession be destroyed.

### CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment is granted. I direct the Clerk of Court to grant a permanent injunction restraining defendant Abel De Luna personally, through Luna Music Corporation, formerly known as Luna Records, Inc., or through any other corporate entity over which he exercises control or from which he derives a financial interest in the exploitation of copyrighted works, from making and distributing phonorecords, or derivative works, of "Dos Amores," Certificate of Registration of a Claim to Copyright No. Ep 311056; "Ambición," Certificate of Registration of a Claim to Copyright No. Eu 793580; "¿Y Como Te Va Con El?," Certificate of Copyright Registration No. PA 279 244; "Se Marcho," Certificate of Registration of a Claim to Copyright No. Efo 149119; "Mi Soldadita," Certificate of Registration of a Claim to Copyright No. Eu 796986 and Certificate of Renewal Registration No. RE 550–739; "Angel of the Morning," Certificate of Registration of a Claim to Copyright No. Ep 232016; and "You Decorated My Life," Certificate of Copyright Registration No. PA 5–228 [hereinafter, the "seven compositions"]; and from otherwise infringing plaintiffs' copyrights in the seven compositions, and

ordering Abel De Luna to deliver up for destruction all copies of the infringing phonorecords of the seven compositions in his possession, custody and control as well as all plates, molds, matrices, mothers, stampers, pressers, winders and any other means for making infringing copies or phonorecords. The Clerk of the Court is further directed to enter judgment awarding statutory damages in the amounts of $20,000 to Peer International Corporation; $10,000 to Peermusic Ltd.; $10,000 to Leo Musical, S.A.; $10,000 to Editorial Musical Latino Americana, S.A.; $15,000 to EMI Blackwood Music Inc.; and $25,000 to Temi Combine, Inc.

The Court will enter judgment separately on the question of attorneys' fees.

**SO ORDERED.**